IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF AN IPHONE LISTED UNDER CASE NUMBER 2019-011722 AS ITEM 2, AN IPHONE LISTED UNDER CASE NUMBER 2019-012677 AS ITEM 6, AND AN IPHONE LISTED UNDER CASE NUMBER 2020-006414 AS ITEM 1 LOCATED AT THE LYNCHBURG POLICE DEPARTMENT'S EVIDENCE STORAGE.** | ) ) ) ) ) ) ) ) ) ) )   Case No.   6:20mj24 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Russell Davidson, a Special Agent with the Alcohol, Tobacco, Firearms and Explosives, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the cellular devices seized from Malik SIMPSON, further described in Attachment A, for the things described in Attachment B.

2. I am a Senior Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, I have been employed with ATF since July 2002 and I am presently assigned to the Roanoke, Virginia Field Office. I have successfully completed the Criminal Investigators Training Program and New Professional Training, ATF National Academy, held at the Federal Law Enforcement Training Center, Glynco, Georgia. Prior to this employment, I was employed as a sworn police officer for the City of Lynchburg, Virginia for eight years. During those eight years, I was assigned to the Vice/ Narcotics Unit

responsible for conducting drug trafficking investigations. Since becoming an ATF Special Agent, I have conducted narcotics and firearms investigations involving large conspiracies. This aforementioned experience has given me the knowledge to recognize the methods used by criminal violators and individuals disposed to commit criminal offenses to conceal their overall criminal activities from law enforcement personnel and other persons.

3. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

4. Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics trafficker to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for

narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The items to be searched are as follows:

   a. An iPhone (hereinafter "Target Cell Phone #1"), stored at the Lynchburg Police Department's evidence storage under case number 2019-011722 as Item 2

   b. An iPhone (hereinafter "Target Cell Phone #2), stored at the Lynchburg Police Department's evidence storage unit under case number 2019-012677 as item 6.

   c. An iPhone (hereinafter "Target Cell Phone #3), stored at the Lynchburg Police Department's evidence storage unit under case number 2020-006414 as item 1.

## STATEMENT OF PROBABLE CAUSE

7. The United States, including the ATF and the Lynchburg Police Department ("LPD"), is conducting a criminal investigation of Malik SIMPSON ("SIMPSON") and others regarding violations distribution of marijuana, in violation of 21 U.S.C. §§ 841 and 846, and possession of firearms and machineguns in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c).

8. On June 24, 2020, SIMPSON was indicted by a grand jury for possession with intent to distribute marijuana, possession of a firearm in furtherance of drug trafficking,

3

possession of a machinegun in furtherance of drug trafficking, and illegal possession of a machinegun. See 6:20-CR-8.

9.      Through the course of this criminal investigation beginning in June of 2018, the LPD VICE/INTEL Unit began receiving information related to SIMPSON and his involvement in distributing marijuana. The LPD also identified SIMPSON as a member of gang known as "Floyd Street" through various forms of gathered intelligence including Confidential Source (CS) debriefs.

10.     On July 10, 2019, Officers with the Lynchburg Police Department attempted to conduct a traffic stop in the City of Lynchburg, VA, after observing a white Ford Focus drive in a reckless manner. The vehicle fled from law enforcement, and eventually crashed a short distance away. During the pursuit, officers were able to observe the driver and passenger, and recognized them to be Floyd Street members J.J. and SIMPSON. Also during the pursuit, SIMPSON was observed throwing a large bag of marijuana out of the car, which was recovered by law enforcement.  Both J.J. (driver) and SIMPSON (passenger) fled from the vehicle after it crashed. Law enforcement searched the vehicle. Inside, law enforcement located a book bag with packaging materials where SIMPSON was seated, and also located TARGET CELL PHONE #1 on the rear floorboard, which was powered on at the time. Officers were unable to apprehend SIMPSON and J.J. at the time of the pursuit, but obtained warrants for their arrest. The amount of marijuana recovered was approximately 36 grams, a distributable amount.

11.     On July 11, 2019, Detective Knabb and Detective Stevenson with the Lynchburg Police Departments VICE/Narcotics Unit observed SIMPSON at the Sunshine Market on Campbell Avenue in the City of Lynchburg. Knabb, knowing SIMPSON was wanted from the previous day's events, directed marked patrol officers to the arrest of SIMPSON, who again fled

on foot during the incident. Knabb also indicated that he observed SIMPSON conduct what appeared to be narcotics transactions, prior to marked police arrival. SIMPSON was taken into police custody during this incident, and a search warrant was subsequently executed at the residence SIMPSON fled into, located at 2307 Cobbs Street in Lynchburg, VA. Officers located a distributable amount of marijuana, along with a Glock .40 caliber handgun in a bag they observed SIMPSON carrying. During the course of the search warrant, SIMPSON was booked, and released on his initial warrant. Officers therefore swore out another warrant for SIMPSON for marijuana distribution, and concealed weapon 2nd offense (Felony), since he was released prior to the completion of the search warrant at the residence. No cellular devices were recovered during this incident.

      12.     SIMPSON was wanted from July 11, 2019 to July 28, 2019, when he was again apprehended by LPD Officers. During that incident, a traffic stop was conducted on a vehicle for a defective brake light in which SIMPSON was a passenger. SIMPSON was placed into custody on his outstanding warrants. Officers on scene developed probable cause to search the vehicle, after smelling the odor of marijuana emanating from within the passenger compartment of the vehicle. A search of that vehicle yielded a bag in the trunk which contained a Glock 9mm handgun, along with approximately 1.4 ounces of marijuana. Officers also located a digital scale in the vehicle, and US currency on SIMPSON's person. Further examination of the Glock handgun revealed it had been altered to be capable of firing as a fully automatic weapon. Officers later obtained video footage from a gas station off of Campbell Avenue, where the initiating Officer had originally observed SIMPSON moments before the traffic stop. Video footage shows SIMPSON quickly get into and out of the trunk of the vehicle he was later stopped in, after observing Police presence in the area. The footage shows SIMPSON quickly get

into the trunk of the car, and it appears as if he is stashing something in the trunk. Officer Kirby, the arresting officer, indicated that the driver, D.M., made statements indicating that they were aware of his presence in the area. During the course of this stop, TARGET CELL PHONE #2 was seized from SIMPSON.

13. The ATF conducted an examination of the firearm seized from SIMPSON, and determined it was altered to fire as a fully automatic machine gun, in violation of US Code Title 26 U.S.C., 5861(d) – possession of an unregistered NFA weapon.

14. During the course of this investigation, two Facebook accounts were identified as being used by SIMPSON to conduct criminal activity. A federal search warrant was conducted for the contents and data of those accounts, and a close examination of over 15,000 pages of digital evidence was conducted by the LPD and ATF. The contents of SIMPSON's Facebook data revealed several things including;

   a. SIMPSON utilized a cellular device to conduct criminal transactions through Facebook, Messenger, Snapchat, text message and phone calls.

   b. SIMPSON was responsible for conducting hundreds of narcotics transactions for various substances including but not limited to marijuana, cocaine, scheduled prescription pills and more. This pattern of activity was documented on a consistent basis back to 2018 through Facebook.

   c. SIMPSON was responsible for buying and trading multiple firearms with other individuals including other gang members. SIMPSON sometimes would trade or pay for firearms with various illicit drugs, most commonly marijuana.

  d. SIMPSON conspired with other offenders to convert his firearm to a fully automatic machine gun. Evidence corroborates SIMPSON's possession and knowledge of the fully automatic firearm seized from him.

  e. Data showed SIMPSON's continued networking and continuance of criminal activity with gang members.

  15. On May 5, 2020, SIMPSON had several outstanding arrest warrants stemming from an incident where he fled from the LPD in a high speed pursuit. The LPD received information that SIMPSON was in the White Rock area in a white vehicle with Virginia tags XVY7817 or similar. Officers located a vehicle matching the description given and conducted a traffic stop. Officers made contact with the driver, J.S., who indicated she had just dropped off groceries at 1131 Lanier Street. Officers detected a strong odor of marijuana in the car, and noted that the passenger seat was laid back, indicating that a passenger had possibly just been in the car trying to avoid detection. Officers responded to 1131 Lanier Street, and found SIMPSON standing in front of the residence, utilizing TARGET CELL PHONE #3. Directly beside SIMPSON was roughly three (3) pounds of marijuana. SIMPSON was searched and also had several Oxycodone pills on his person. Officers conducted a search warrant of the residence, and did not locate any other items of interest. SIMPSON was arrested on his outstanding charges, as well as additional drug distribution and possession charges.

  16. On May 5, 2020, SIMPSON made a recorded call from the Blue Ridge Regional Jail to 434-426-3659 and spoke to a female. SIMPSON instructed the female to text 434-509-8547, and instructed them to cut the phone off and lock it up "like before." He also said to de-activate it "before." Your affiant believes through his training knowledge and experience that

SIMPSON is asking the female to reset his phone remotely before law enforcement can download its contents.

17. In reviewing SIMPSON's criminal history, your affiant has learned that SIMPSON has a pattern of criminal activity with firearms and drugs going back to 2016. SIMPSON is not a convicted felon.

18. SIMPSON has not made any request to the LPD or ATF for the return of Target Cell Phone #1, Target Cell Phone #2, or Target Cell Phone #3.

19. Based on SIMPSON's pattern of criminal activities, your affiant believes a search of SIMPSON's cellular phones will further the criminal investigation into SIMPSON. Your affiant knows that drug dealers typically use cellular devices to set up and coordinate drug transactions and other criminal activity. Cellular phones not only provide detailed description of the criminal activities being conducted, but also show the criminal network including other members, locations and activities. SIMPSON's attempt to have his cellular phone cleaned of evidence further proves the contents of the phone will further the investigation into SIMPSON, as well as co-conspirators.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera:*  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player:*  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.

    Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21. Based on my training, experience, and research, I know that the devices described in Attachment A have capabilities that allow them to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it contains evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Russell Davidson*
Russell Davidson
Special Agent, ATF

Received by reliable electronic means and sworn and attested to by telephone on this  8th  day of September 2020.

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE

14